EXXON CORPORATION, Appellant,

v.

Mary TIDWELL and Terry
Tidwell, Appellees [1].

No. 05–90–01087–CV.

Court of Appeals of Texas,
Dallas.

July 29, 1991.

Rehearing Denied Sept. 17, 1991.

---

**1.** When this lawsuit was initiated, Mary Tidwell sued individually and as next friend of Terry Tidwell, who was then a minor. However, Terry attained majority age during the pendency of the lawsuit, and the trial court's judgment awards sums of money directly to both Mary and Terry in their individual capacities.

**458**

Jeffrey L. Scharader, William R. Hurt, Peggy O. Donley, Houston, for appellant.

Timothy M. Fults, Dallas, Smith E. Gilley, Greenville, Robert C. Fults, Dallas, for appellees.

Before ROWE, WHITTINGTON and CHAPMAN, JJ.

## OPINION

ROWE, Justice.

Exxon Corporation appeals from a judgment rendered in favor of Mary Tidwell and Terry Tidwell in a negligence action. Exxon asserts thirty-eight points of error. We sustain point number thirty-six regarding mental anguish damages awarded to Mary and overrule the remaining points. We reverse that part of the trial court's judgment awarding mental anguish damages to Mary and remand this cause for recomputation of prejudgment interest to be awarded to Mary; in all other respects, we affirm the judgment.

On the evening of November 4, 1987, Terry Tidwell was the only employee on duty at an Exxon service station located at the intersection of Interstate Highway 30 and U.S. Highway 69 in Greenville, Texas. At approximately 10:00 p.m., Terry was shot by Eric Todd Jones in the course of a robbery attempt. Terry was wounded in his mouth and arm.

Terry's mother, Mary Tidwell, filed suit against Jones and Exxon. When the suit was filed, Terry was a minor; he attained majority age during the pendency of the lawsuit. The trial was before the court, and the court filed findings of fact and conclusions of law. Terry obtained a judgment against Jones for damages; Jones is not a party to this appeal. Both Terry and Mary obtained a judgment for damages against Exxon based on negligence, and Exxon has appealed.

In points of error one through thirty-one, Exxon contends that the Tidwells failed to establish that Exxon owed them any duty. Alternatively, Exxon argues that the Tidwells failed to establish the breach of any duty. Many of the points attack the legal and factual sufficiency of the evidence underlying the trial court's findings and conclusions.

The Tidwells, in their first reply point, argue that the judgment should be affirmed because Exxon failed to complain of some findings and conclusions that are adequate to support the judgment. *See Able v. Able*, 725 S.W.2d 778, 780 (Tex.App.— Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Schismatic and Purported Casa Linda Presbyterian Church v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 707–08 (Tex.App.—Dallas 1986, writ ref'd n.r.e.), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 46 (1987). We disagree. Exxon's numerous points of error do not specify by number the findings and conclusions that are attacked. The Tidwells have nevertheless attempted to specify the findings and conclusions that were and were not attacked. However, when we examine the substance of the various points, we find that they sufficiently attack all of the findings and conclusions necessary to the trial court's judgment. Although some specific findings and conclusions are not directly attacked, other more general findings and conclusions are attacked. We are of the opinion that these general findings and conclusions necessarily encompass all of the more specific findings and conclusions upon which they are based. Accordingly, we address the merits of Exxon's complaints.

Actionable negligence consists of three essential elements: a legal duty owed by one person to another, a breach of that

duty, and damage proximately caused by the breach. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *see Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975). Duty is the threshold inquiry. *El Chico,* 732 S.W.2d at 311. The existence of a legal duty under a given set of facts and circumstances is essentially a question of law for the court. *Gray v. Baker & Taylor Drilling Co.,* 602 S.W.2d 64, 65 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.) (op. on mot. for reh'g).

The record shows that Terry Tidwell was employed by Jerry Morgan at the Exxon station that Morgan operated. Exxon owned the real property on which the station was located, and Exxon owned at least some of the equipment located at the station. Exxon, as lessor, leased the property to Morgan, as lessee. Many of the issues at trial involved the degree of control exercised by Exxon with respect to the leased property and Morgan's business operations. Many of the trial court's findings and conclusions are supportive of the ultimate determination that Exxon had rights of control and exercised actual control to the extent that a master-servant relationship existed between Exxon and Morgan.

■ Although the existence of a legal duty owed by one party to another is essentially a question of law, the issue as to the nature of the relationship between an oil company and a service station operator is ordinarily a fact question involving a determination of who has the right of control over details of the operation. *Humble Oil & Refining Co. v. Martin,* 148 Tex. 175, 177–78, 222 S.W.2d 995, 997–98 (1949). With respect to the question of the existence of a duty, much can turn on the issue of whether the relationship between the oil company and the station operator is, on the one hand, one of landlord and tenant or independent contractors, or, on the other hand, one of master and servant. *See id.,* 148 Tex. at 177–80, 222 S.W.2d at 997–99; *Texas Co. v. Wheat,* 140 Tex. 468, 470–74, 168 S.W.2d 632, 633–35 (1943). In the context of a master-servant relationship, an employer owes certain nondelegable and continuous duties to its employees, including the duty to warn employees of hazards of their employment, the duty to furnish a reasonably safe place in which to work, and the duty to furnish reasonably safe instrumentalities with which employees are to work. *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975).

■ If there is to be a duty to provide protection from the criminal acts of a third party committed on certain premises (or a duty to provide protection from other hazards), one of the requisites for imposition of such a duty is the defendant's power of control with respect to the premises and operations on the premises.[2] *LaFleur v. Astrodome–Astrohall Stadium Corp.,* 751 S.W.2d 563, 564–65 (Tex.App.—Houston [1st Dist.] 1988, no writ); *see Robert E. McKee, Gen. Contractor v. Patterson,* 153 Tex. 517, 519, 271 S.W.2d 391, 393 (1954). In determining whether a relationship goes beyond that of independent contractors or lessor and lessee, the primary test used involves a determination as to which of the parties to the relationship possesses the right of control over the details of the operation. *See Newspapers, Inc. v. Love,* 380 S.W.2d 582, 590 (Tex.1964); *Texas Co. v. Wheat,* 140 Tex. at 473, 168 S.W.2d at 635. The actual exercise of control necessarily presupposes a right of control. *Newspapers, Inc.,* 380 S.W.2d at 590. Accordingly, we examine the record to see if the evidence supports the trial court's findings and conclusions that Exxon had the right of control, and actually exercised control, to the extent that imposition of a duty of reasonable care was warranted.

■ Exxon attacks both the legal and factual sufficiency of the evidence regarding control. A trial court's findings of fact are reviewed using the same standards as are applied in reviewing the factual and legal sufficiency of the evidence supporting a jury's answers to jury questions. *Aerospatiale Helicopter Corp. v. Universal Health Services, Inc.,* 778 S.W.2d 492, 497 (Tex.App.—Dallas 1989, writ denied), *cert. denied,* —— U.S. ——, 111 S.Ct. 149, 112

---

**2.** Foreseeability of the criminal conduct is an additional requisite that we deal with later.

L.Ed.2d 115 (1990); *Creative Mfg., Inc. v. Unik, Inc.*, 726 S.W.2d 207, 210 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.); *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex. Civ.App.—Dallas 1981, writ ref'd n.r.e.). In reviewing the no evidence points, we are required to consider only the evidence and inferences that tend to support the jury's findings, disregarding all evidence and inferences to the contrary. *Jacobs v. Danny Darby Real Estate, Inc.*, 750 S.W.2d 174, 175 (Tex.1988). A no evidence point should be sustained only when the record discloses one or more of the following: (1) a complete absence of evidence of a vital fact, (2) the only evidence offered to prove a vital fact is barred from consideration by rules of law or evidence, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 795 n. 3 (Tex.1991). In reviewing Exxon's factual insufficiency points, we must consider and weigh all of the evidence, and we cannot set aside a finding unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). Generally, no evidence points should be addressed first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam).

■ We begin by examining the two contracts entered into by Morgan and Exxon. The parties' lease agreement provides that Morgan was to use and operate the premises only as a service station. The agreement prohibits the sale of food items, beverages, or automotive products (except soft drinks and snack foods from vending machines, candy, ice, and cigarettes) without Exxon's prior written consent. Morgan was also contractually obligated to keep the station open twenty-four hours each day with no exceptions. He was required to keep the premises in a clean, sanitary, and orderly condition in reasonable conformity with guidelines "as may be . provided to Lessee by Exxon."

Morgan was prohibited from making additions, changes, or alterations to the internal or external structure of the buildings, improvements, driveways, or equipment provided by Exxon. He could not place additional improvements or equipment on the premises without first obtaining Exxon's written consent. The contract provided that Morgan could not display any signs unrelated to the service station business without Exxon's prior written consent, nor could he display signs that did not reasonably conform to guidelines on design, color, image, and placement "as may be provided by Exxon." Morgan was required to maintain adequate records for the control of underground fuel inventory, and Exxon was given the right to inspect Morgan's inventory reconciliation records at any time.

Morgan was obligated to render "appropriate, prompt and efficient services to Lessee's customers, to respond expeditiously to all complaints of such customers, making fair adjustments where appropriate." In selling soft drinks, snack foods, candy, cigarettes, ice, and other "approved" merchandise items, Morgan was required to use vending machines, ice machines, and display units that reasonably conformed to appearance and placement guidelines "as may be provided to Lessee by Exxon." Exxon had the right to modernize and reconstruct, including the right to completely demolish and rebuild any and all facilities and the right to eliminate, change, or add physical structures, equipment, and operating facilities.

Morgan and Exxon also entered into a sales agreement. This contract provided that Morgan was required to purchase a minimum volume of fuel from Exxon. Morgan was bound by the terms and provisions of Exxon's Automotive Credit Card Guide and Agreement. With respect to the sale of non-Exxon products, Morgan was required to protect the identity of Exxon products and to conform to Exxon's De-identification Guidelines. To promote maintenance of a high level of customer acceptance of Exxon products, Morgan had to keep the premises open in accordance with the separate lease agreement. In op-

erating the premises, Morgan was required to render appropriate, prompt, efficient, and courteous service to customers and to respond expeditiously to customer complaints, making fair adjustments when appropriate.

Morgan was obligated to keep the premises in a good state of repair and to keep the restrooms clean, orderly, sanitary, and adequately furnished with supplies, all in reasonable conformity with appearance and image guidelines "as may be provided to the Buyer by Exxon." He had to provide a sufficient number of qualified and appropriately uniformed attendants in order to render first class service to customers. Exxon provided to Morgan a copy of the "Quality Assurance Guidelines for Exxon Unleaded Gasoline Retailer," which document was made a part of the sales agreement, and Morgan was required to comply with the procedures contained in this incorporated document.

In our view, the contracts alone provide some evidence that Exxon had the right of control over details concerning the premises and the operations on the premises. The sale of certain items, including automotive products, was prohibited in the absence of Exxon's prior written consent. The contracts provided for regulation by Exxon of the display of signs and products. Morgan was required to comply with the provisions of a credit card guide and agreement and a document containing quality assurance guidelines. With respect to control over aspects of the premises and operations more closely related to the incident at issue, Exxon required that the service station remain open twenty-four hours every day. Exxon prohibited Morgan from making additions or changes to the internal and external structure of the buildings and improvements without Exxon's prior written consent. Exxon had the right to modernize and reconstruct the facilities.

 Regardless of whether the relationship between Exxon and Morgan rose to the level of a master-servant relationship, we determine that there was some evidence that Exxon possessed rights of control sufficient to constitute one of the requisites for imposition of a legal duty to provide a reasonably safe place to work. Even in the context of an independent contractor relationship, the retention of some control may subject the party possessing that right of control to liability for negligence. *See Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985). In view of the operative contractual provisions involved in this case, we cannot say that there was no evidence of Exxon's right of control over details concerning the premises and operations on the premises.

In considering Exxon's factual insufficiency points, we now review all of the evidence regarding control. Exxon places particular reliance upon paragraphs 19 and 20 of the parties' lease agreement. We quote paragraph 19 in its entirety:

It is understood that Lessee operates an independent business. Nothing in this lease shall be construed as reserving or granting to Exxon the right to exercise any control over Lessee's business or the manner in which same shall be conducted; but the control and direction of such business and operations shall be and remain in Lessee, subject only to Lessee's performance of the obligations of this lease. Lessee agrees to display conspicuously on the premises such signs as Exxon may provide to Lessee for the purpose of communicating to Lessee's customers that Lessee is an independent businessman. Exxon shall not be liable to Lessee or Lessee's employees, agents, patrons or invitees, or to any person whomsoever, for any injury to person or damage to property caused by the negligence or misconduct of Lessee, its agents, servants or employees, or of any other person entering upon the premises under the express or implied invitation of Lessee.

In pertinent part, paragraph 20 states, "With respect to the premises, it is the intention of Lessee and Exxon to create a landlord-tenant relationship only."

Paragraph 19 provides that Morgan shall have the power of control and direction of the business, and both contracts contain numerous provisions that are not particu-

larly indicative of rights of control granted to Exxon. Nevertheless, the provisions relied upon by Exxon must be viewed together with the numerous other provisions discussed previously. We note that paragraph 19 states that Morgan's power of control and direction of the business is subject to his performance of the lease obligations. Many of those obligations effectively grant significant powers of control to Exxon.

The record also contains testimony regarding Exxon's rights of control. Morgan testified that, without Exxon's permission, he could not use the premises for parking or storage or rental of motor vehicles. Any substantial alterations in the building would have to be the subject of consultations with Exxon. Morgan stated that the station was not equipped with a pass-through window. He said that he could not have installed one on his own because Exxon's permission would have been required. Installation of sensors and alarms also would have required Exxon's permission.

There was also evidence concerning the issue of actual exercise of control. Terry Tidwell testified that he was not allowed to close and lock the service station's bay doors because it was Exxon's policy to keep them open so that it would look like the station was open for business. When asked if Morgan had stated that this policy was Exxon's policy or Morgan's policy, he said that Morgan told him that it was a requirement imposed by Exxon.[3]

Morgan gave testimony about an Exxon incentive plan designed to encourage him to keep the station open twenty-four hours a day. (As previously noted, Morgan was contractually obligated to keep the station open continuously.)[4] He stated that Exx-

on made the decision regarding what credit cards he would honor. In order to get his money back on credit purchases, he had to go through Exxon's system. He later stated that the credit card agreement specified the credit cards approved by Exxon. He was not supposed to purchase or sell any gasoline other than Exxon gasoline. Morgan carried other brands of oil but, in accordance with Exxon's preference, he did not display them, instead keeping them in the back. He said this same practice applied to tires, batteries, and accessories.

On cross-examination, Morgan testified about an Automotive Credit Card Guide and Agreement. He said that it did not prohibit him from accepting credit cards other than Exxon credit cards, nor did it require that he accept Exxon credit cards. He testified about a letter received from Exxon regarding the sale of non-Exxon motor fuels. Morgan agreed that he was not contractually obligated to buy all of his motor fuels from Exxon. There was a procedure that allowed him to sell non-Exxon motor fuels. The letter noted that Morgan was required under the sales agreement to provide a representative offering of Exxon fuel. Morgan stated that he considered himself to be an independent businessman. He said that he had agreed to the various contractual provisions governing his relationship with Exxon. He operated a wrecker business from the service station property without consulting with Exxon about it. Morgan said that he was never instructed by Exxon to keep the station's bay doors open.

Randy Roberts testified that he was a former Exxon dealer who operated an Exxon station in Greenville.[5] When shown

---

3. The evidence indicated that the assailant had entered through one of the bay door openings and then through a door connecting the bay area and the sales office area.

4. The record contains an amendment to the lease agreement that effectively deleted the requirement that Morgan keep the station open twenty-four hours per day. This amendment was dated January 29, 1988 and was signed by the parties on February 5, 1988, several months *after* the injury sustained by Terry Tidwell.

5. In point of error twenty-eight, Exxon contends that the trial court erred in denying Exxon's motion to strike Roberts's testimony. Exxon's very short argument on this point in its brief contains no citation to any authority. This failure to cite authority constitutes a waiver of the asserted error. *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 810 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988); *see King v. Graham Holding Co.*, 762 S.W.2d 296, 298–99 (Tex.App.—Houston [14th Dist.] 1988, no writ). Moreover, Exxon's objection to Roberts's

Morgan's lease agreement with Exxon, he stated that it was the same form as his lease agreement with Exxon. Roberts's lease agreement provided for hours of operation from 6:00 a.m. to 10:00 p.m. Roberts said that two Exxon representatives told him that he needed to leave the bay doors open at all times during the hours of operation to give the appearance of being ready to do business. They also told him that he could close the doors during cold weather in winter.

Roberts stated that Exxon either directly or indirectly established his selling price for gasoline because Exxon wanted his cheapest gas to undercut the competition across the street. Exxon did not want him to sell non-Exxon brand motor oil. Exxon's sales representative told him to keep non-Exxon brands in the back. Roberts said that he was required to buy his fuel from Exxon. Exxon made the decision as to what credit cards he could accept; he was told that he could not take American Express without Exxon's approval. He characterized the attitude of Exxon representatives as being one of "Exxon's way or no other way."

On cross-examination, Roberts testified about some financial problems that he had involving difficulties in paying his rent and paying for the products he bought from Exxon. He said that he had purchased motor fuels from suppliers other than Exxon. He admitted that he had bought Conoco fuel and sold it under the Exxon brand name in violation of his lease agreement with Exxon. As to competitive pricing, Roberts said that it was his choice whether to abide by the counseling provided by Exxon representatives. He agreed that title passed to him when he bought products from Exxon and that any profits realized on those products were his. He received no salaries or commissions from Exxon, and benefits offered to Exxon employees were not available to Roberts's employees.

When asked about a provision in the lease stating that the lease agreement contained the entire agreement between himself and Exxon, Roberts replied, "[N]o offense, but because that is what the lease says that is not exactly what actually happened." He said that Exxon representatives sometimes varied from the governing agreements with respect to pricing of gasoline and display of non-Exxon brands of oil. Roberts stated that the Exxon sales representative would come by and sit him down and tell him how things needed to be, how Exxon really wanted the station run as to pricing, what was actually to be sold, and the image that was to be maintained.

John Hallmark, an Exxon sales representative who dealt with Morgan, testified that he could not supersede or override business decisions made by an Exxon lessee-dealer. He said that he could not recall discussing the bay doors with Morgan. He stated that Morgan and Roberts established the prices for the products they sold. Neither Morgan nor his employees had employment contracts with Exxon, and they did not participate in any benefit plans offered to Exxon employees. He testified that Morgan would not have been able to install bullet-resistant glass without Exxon's approval.

Mike McNutt, an Exxon employee, testified about an Exxon policy manual developed in 1971 (when Exxon was known as Humble). With respect to safety and security, this manual stated, "During nighttime operation, close and lock bay doors—especially when only one man is on duty." However, McNutt's testimony indicated that this manual was no longer used as of the time of trial, nor was it used in 1987.

The findings of fact attacked by Exxon include the following: (1) Exxon required Morgan's station to remain open twenty-four hours every day; (2) the service station's bay doors were left open at the encouragement of Exxon; (3) a master-servant relationship existed between Morgan and Exxon; (4) Exxon had the right to specify standards of operation of the station regarding cleanliness, sanitation, and

---

testimony came only after considerable testimony had been received from Roberts. Therefore, the objection was untimely. Accordingly, no

error was preserved for appellate review. *See* Tex.R.App.P. 52(a).

the condition of the station; (5) Exxon had the right to specify the design, color, image, and placement of signs; (6) Exxon had the right to direct Morgan in the details of operating the station; (7) Exxon had the right to specify the manner in which Morgan would render services to his customers; (8) Exxon had the right to specify the use, appearance, and placement of vending machines, ice machines, and display units; (9) acceptable credit cards used by Morgan were determined by Exxon; (10) Exxon retained substantial control over the manner in which Morgan operated the station.

In reviewing Exxon's factual insufficiency points, we note that this Court is not a fact finder, and we cannot substitute our judgment for that of the trial court, as fact finder, even if a different finding could be reached on the evidence. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). It is within the province of the trier of facts to weigh the evidence and assess the credibility of the witnesses. The trial court, as fact finder, was the judge of the facts proved *and* of the reasonable inferences to be drawn therefrom. *See Lockley v. Page,* 142 Tex. 594, 598, 180 S.W.2d 616, 618 (1944). The trial court had the opportunity to observe the demeanor of the witnesses as an aid in assessing the weight and credibility of the testimony, whereas we are confined to examination of the transcribed testimony.

We conclude from the record that, at the least, the findings of the trial court listed above regarding Exxon's control were supported by sufficient evidence. We acknowledge that the evidence concerning many of the findings was conflicting. Moreover, sometimes the testimony of a witness appeared to be inconsistent with other testimony given by the same witness. Nevertheless, it is well established that the fact finder may resolve conflicts and inconsistencies in the testimony of any one witness and in the testimony of different witnesses. *Webb v. Jorns,* 488 S.W.2d 407, 411 (Tex.1972).

Case law indicates the factors that have been regarded as indicative of something more than a relationship between independent contractors or lessor and lessee. Those factors include the following: (1) the oil company controlled the hours of operation, *Humble Oil & Refining Co. v. Martin,* 148 Tex. at 178, 222 S.W.2d at 998; *O'Neill v. Startex Petroleum, Inc.,* 715 S.W.2d 802, 805–06 (Tex.App.—Austin 1986, no writ); *Space City Oil Co. v. McGilvray,* 519 S.W.2d 257, 259 (Tex.Civ. App.—Beaumont 1975, no writ); (2) the oil company established the prices at which products were to be sold to the public, *Martin,* 148 Tex. at 179, 222 S.W.2d at 998; *O'Neill,* 715 S.W.2d at 805–06; *McGilvray,* 519 S.W.2d at 259; (3) the oil company determined the credit cards that could be accepted, *O'Neill,* 715 S.W.2d at 805–06; *McGilvray,* 519 S.W.2d at 259; (4) the oil company had the right to set standards of operation pertaining to cleanliness and customer service, *McGilvray,* 519 S.W.2d at 259; (5) alterations or improvements of the buildings could not be made without the oil company's consent. *O'Neill,* 715 S.W.2d at 805–06. In addition to the above factors, we regard as significant the oil company's right to control the design, color, and placement of signs; the right to control the placement and display of products; the right to control the appearance and placement of vending machines, ice machines, and display units; and the right to prohibit the sale of products, including automotive products, without the oil company's prior consent. Although at least some of the factors, standing alone, would not necessarily constitute sufficient evidence of control over details, the factors in combination constitute, in our view, significant evidence of such control.

There was evidence of the existence of all of these listed factors. We determine that there was sufficient evidence warranting the finding that Exxon possessed the right to control and actually exercised substantial control over details with respect to the premises and operations on the premises. More specifically, there was sufficient evidence that Exxon required twenty-four hours per day operation

and that it encouraged a policy of keeping the bay doors open. As to the policy of keeping the bay doors open, Terry Tidwell and Roberts gave testimony supportive of the trial court's finding that such a policy was mandated by Exxon. Although Morgan gave contrary testimony, it was the trial court's prerogative to resolve the conflict. Exxon also retained the right to make additions, changes, or improvements to the structures on the premises, and Morgan could not make such changes without Exxon's consent. And there was additional evidence that Exxon possessed rights of control, and actually exercised control, with respect to numerous other details regarding the premises and operations thereon. Although a few collateral findings may lack evidentiary support, we hold that an ample number of findings supported by the evidence justify the trial court's ultimate conclusions of law concerning Exxon's control.

However, Exxon's rights of control and actual exercise of control are not alone sufficient to impose upon Exxon a duty of reasonable care with respect to prevention of the type of harm involved in this case. We now turn to the second requisite for imposition of such a duty with respect to the incident at issue, namely the foreseeability of third party criminal conduct posing a risk of harm to those employed at the station. Exxon asserts that the evidence was both legally and factually insufficient to support the trial court's findings regarding foreseeability of the harm.

■■■ Duty is the function of several interrelated factors, and the foremost and dominant consideration is foreseeability of the risk of harm. *El Chico Corp. v. Poole,* 732 S.W.2d at 311. Generally, the criminal conduct of a third party is a superseding cause which relieves a negligent actor from liability. However, a tortfeasor's negligence will not be excused when the criminal conduct is a foreseeable result of the negligence. *Id.* at 313–14; *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 550 (Tex.1985). Foreseeability does not require that the alleged tortfeasor anticipate the particular harm; he need only

reasonably anticipate the general character of the injury. *El Chico,* 732 S.W.2d at 313; *Edwards Transfer Co. v. Brown,* 740 S.W.2d 47, 51 (Tex.App.—Dallas 1987), *aff'd,* 764 S.W.2d 220 (Tex.1988). Although criminal acts do occur occasionally and thus may be foreseeable in a broad sense, one who exercises control over premises has no duty to guard against dangers that he cannot reasonably foresee in the light of common or ordinary experience. *See Hendricks v. Todora,* 722 S.W.2d 458, 461 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (op. on reh'g).

■■■ We first consider Exxon's contention that there was no evidence of foreseeability of the risk of harm. Kent McCutchen had leased and operated an Exxon station at Interstate Highway 30 and Lamar Street in Greenville from December 1983 to November 1987. He testified that two robbery incidents occurred at his station during that period. Both incidents occurred at night, and both occurred prior to the incident at Morgan's station involving Terry Tidwell. McCutchen said that one of his employees was injured in the first robbery. The second incident was an attempted robbery that involved a scuffle between the perpetrator and one of McCutchen's employees. After the second incident, McCutchen asked the Exxon sales representative, John Hallmark, about the possibility of installing a pass-through window at the station. McCutchen believed that this conversation with Hallmark occurred before the robbery attempt at Morgan's station. McCutchen also testified about new or modernized Exxon stations at Sulphur Springs and Royce City with security measures such as pass-through windows built into them.

We determine that McCutchen's testimony alone constitutes some evidence that an incident like the one at issue in this case was foreseeable. Both criminal incidents at McCutchen's station occurred at night; the assault upon Terry Tidwell at Morgan's station occurred at night. McCutchen's station was located on Interstate Highway 30; Morgan's station was also located on the Interstate. McCutchen discussed the

possibility of added security measures at his station with Hallmark after the two incidents at McCutchen's station. Although McCutchen did not state that his conversation with Hallmark included references to the two prior incidents, we think that the trial court, as the fact finder, could well have reached the reasonable inference that the discussion probably included such references. In the light of this evidence, as well as the inferences that could reasonably be drawn therefrom, we cannot say that there was no evidence supporting the determination that the harm was reasonably foreseeable.

■ We proceed to measure the factual sufficiency of the evidence of foreseeability. Randy Roberts, who had leased and operated the Exxon station at Wesley and Loop 315 in Greenville, testified that the station was burglarized just before he leased it. He said that he was concerned about security because other stations on the Interstate highway had been robbed. He asked an Exxon representative about the possibility of keeping a gun on the premises as a security measure.

Brian Hurst testified that he was robbed while working at Morgan's Exxon station. He believed that the robbery occurred in the fall of 1985. It happened at night at about 1:00 a.m. On cross-examination, he stated that he never had any conversations with any Exxon representatives. He said that he was not harmed as a result of the robbery.

Marvin Wise, a private investigator and a former Dallas police officer with experience in the patrol, vice control, and intelligence divisions, testified as an expert witness. He had performed security investigations and inspections for a number of insurance companies, and he had advised some commercial businesses on the subject of security. He stated his professional opinion that he would recommend certain security measures at all-night service stations on Interstate highways because there are so many robberies at night and the attendants are alone at night. He said that his investigation revealed that there had been robberies at convenience stores and service stations in Greenville. Wise's report noted that several Exxon stations in the north Texas area (Greenville, Dallas, Richardson, Mesquite, Royce City, Garland), including stations that were relatively old but had been modified, had night cashier pay windows as security measures. Based on his experience, Wise testified that most robberies at service stations like Morgan's occur at night.

Morgan testified that one robbery had occurred at his station prior to the incident at issue. He said that Exxon learned of the Terry Tidwell shooting shortly after it happened. He stated that he had a discussion with Hallmark, his Exxon sales representative, about one of the robbery incidents at the McCutchen station.

Terry Tidwell testified that he never talked to any Exxon representative about security at the Morgan service station.

John Hallmark, an Exxon sales representative who dealt with Morgan, testified that McCutchen had installed a pass-through window at his station for protection because he stayed open at night. Hallmark said that he was aware that a shooting had occurred at McCutchen's station. He agreed that robberies are more likely to occur at night. He stated that the principal purpose of bullet-resistant glass was protection of the employee. Hallmark was aware of some dealer requests for bullet-resistant glass and pass-through windows. He thought that such requests were made because of security concerns. He said that he knew that service stations were robbed and people were shot in Greenville, Sulphur Springs, and Texarkana as well as Dallas.

Hallmark stated that he was not aware of any robberies at Morgan's station prior to the incident involving Terry Tidwell. During the time that he had responsibility for the Greenville area, he had knowledge of only one robbery at a retail business establishment, that being a robbery at McCutchen's station. He discussed security measures with Morgan only after Terry was shot. He noted that Exxon had developed an exact cash program that was designed to deter robberies. He thought that all new stations built today by Exxon have

pass-through windows for security and protection of property and employees. Hallmark agreed that it was not uncommon for service stations in the Greenville area to be robbed.

Jimmy Sturdevant, who was assigned to the law department in the security division at Exxon, testified that service stations are more vulnerable to criminal attacks between the hours of 10:00 p.m. and 2:00 a.m. He said that the security risks are greater at stations on Interstate highways.

Robert Atherton, an engineering supervisor with Exxon, testified that Exxon had a security retrofit program whereby Exxon would modify existing stations for purposes of enhanced security. He indicated that the program was at least ten years old. He said that bullet-resistant glass and pass-through windows are designed to insulate the attendant from the public.

Mike McNutt, an Exxon employee, testified that Exxon's exact cash program dramatically decreased robberies and incidents involving physical harm. He stated that the number of Exxon stations equipped with pass-through windows had been growing every year for the past several years. He said that bullet-resistant glass and pass-through windows were implemented as a response to service station robberies.

We determine that there was ample evidence supporting the trial court's findings and conclusions regarding foreseeability. In other words, there was considerable evidence that the kind of incident at issue in this case was reasonably foreseeable by Exxon. There was direct evidence that Exxon had actual knowledge of at least one robbery of an Exxon station in the Greenville area. And there was evidence that would have permitted a reasonable inference that Exxon acquired actual knowledge of other robberies or attempted robberies at Exxon stations. There were ongoing communications between Exxon representatives and Exxon dealers, and some of those communications involved security.

We think that the trial court, as the fact finder, could have reasonably inferred that some reference was made to the robbery incidents in the course of those communications.

Moreover, determinations of foreseeability can properly involve more than actual knowledge of particular incidents. Foreseeability should be measured in the light of common or ordinary experience. *See Hendricks v. Todora*, 722 S.W.2d at 461. The determination as to whether a risk of harm is reasonably foreseeable cannot necessarily be divorced from common knowledge. *See El Chico Corp. v. Poole*, 732 S.W.2d at 311 (discussing common knowledge regarding effects of alcohol consumption in context of foreseeability). In this regard, we note that there was testimony indicating that service station robberies are more likely to occur at night and at stations located on Interstate highways. Wise testified that robberies had occurred at service stations in Greenville, and Hallmark, an Exxon employee, agreed that such occurrences were not uncommon. An Exxon employee testified that stations located on Interstate highways are subject to greater risk of robbery and are particularly vulnerable between the hours of 10:00 p.m. and 2:00 a.m.[6] There was evidence that Exxon had undertaken a number of preventive measures at some of its stations in response to the risks associated with robberies.

We hold that there was sufficient evidence to support the trial court's findings and conclusions regarding foreseeability. There was considerable evidence indicating that Exxon could have reasonably foreseen the type of injury suffered by Terry Tidwell. To the extent that the ultimate issue concerning foreseeability is a question of law (as a component of duty), we agree with the trial court and hold as a matter of law that the injury was reasonably foreseeable.[7] The common law of torts, including

---

6. Terry Tidwell was attacked at approximately 10:00 p.m.

7. In addition to some of the cases cited in the body of this opinion, both parties have cited a number of other cases in support of their arguments regarding foreseeability. *See Garner v. McGinty*, 771 S.W.2d 242 (Tex.App.—Austin 1989, no writ); *Ronk v. Parking Concepts of Texas, Inc.*, 711 S.W.2d 409 (Tex.App.—Fort

the concept of duty, must evolve in light of the changing conditions and circumstances of society. *El Chico,* 732 S.W.2d at 310–11; *see Reagan v. Vaughn,* 804 S.W.2d 463, 465 (Tex.1990); *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 310 (Tex.1983). It is a matter of general and common knowledge that violent crime has become a significant and pervasive social problem. Virtually all members of society, in their various capacities, would be well advised to respond to the problem. Many people do in fact adjust their behavior in order to prevent or avoid the consequences of criminal activity. Those who fail to make such adjustments do so at their peril.

■ We now proceed to determine the propriety of the trial court's conclusion that Exxon breached its duty of reasonable care owed to Terry.[8] With respect to the evidence already recited, there was the evidence indicating that Exxon encouraged the practice of leaving the bay doors open. (Terry Tidwell's assailant entered the station through one of those doors.) Exxon required the business to remain open twenty-four hours per day, thereby increasing the chances of robbery at the station. No alterations to the premises, including preventive security measures, could be undertaken without Exxon's approval.

There was considerable evidence related to one preventive measure that Exxon could have taken and did not take at Morgan's station, namely, installation of bullet-resistant glass and a pass-through window. The evidence indicated that such measures effectively shield a lone attendant working at night from injury caused by a firearm. There was evidence that the installation acts as a deterrent to armed robbery. Further, if an armed assailant was not deterred, the bullet-resistant glass would provide protection. There was evidence that other Exxon stations were equipped with pass-through windows and bullet-resistant glass. Exxon had a program for modifying existing stations by installing these protective measures. Such modifications served the purpose of protecting property and the persons employed at Exxon stations.

McCutchen testified that, after the second robbery at his station, he installed a pass-through window. He stated that he had not been robbed since the installation. Wise expressed his expert opinion regarding security precautions that could have been taken to prevent an occurrence like the Terry Tidwell shooting. He recommended a night cashier window[9] with bullet-resistant glass. He recommended that the bay doors should have been kept closed. He recommended various other measures, such as a convex mirror and alarm systems.

We determine that there was ample evidence in support of the ultimate conclusion that Exxon breached its duty of reasonable care with respect to Terry Tidwell. In summary, we determine that Exxon possessed rights of control, and actually exercised control, over details concerning the Morgan station premises and operations on those premises. We also determine that injuries of the type suffered by Terry Tidwell were reasonably foreseeable by Exxon. Because of its control over the premises and operations thereon, we hold that Exxon owed a duty of reasonable care to Terry and others similarly situated. *See Redinger v. Living, Inc.,* 689 S.W.2d at 418; *Robert E. McKee, Gen. Contractor v.*

Worth 1986, writ ref'd n.r.e.); *Allright, Inc. v. Pearson,* 711 S.W.2d 686 (Tex.App.—Houston [1st Dist.] 1986), *aff'd in part and rev'd in part on other grounds,* 735 S.W.2d 240 (Tex.1987); *Walkoviak v. Hilton Hotels Corp.,* 580 S.W.2d 623 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). We have considered these cases. However, we regard none of them as dispositive. All involved factual circumstances different in at least some respects from the facts of this case. The instant case involved considerable evidence concerning the issue of foreseeability. To the extent that foreseeability of the harm is related to the underlying facts related to

foreseeability, the question of foreseeability must be decided in light of the facts presented in a particular case.

8. Exxon does not contest the existence of proximate cause; accordingly, we accept the trial court's findings and conclusions in support of proximate cause.

9. Apparently, the night cashier window is simply another term used to refer to what others called a pass-through window.

*Patterson*, 153 Tex. at 519, 271 S.W.2d at 393; *LaFleur v. Astrodome–Astrohall Stadium Corp.*, 751 S.W.2d at 565. That duty included the duty to avoid the harmful results of foreseeable third party criminal conduct resulting from Exxon's negligent acts or omissions. *See El Chico*, 732 S.W.2d at 313–14; *Nixon v. Mr. Property Management Co.*, 690 S.W.2d at 550; *LaFleur*, 751 S.W.2d at 564. Finally, we hold that the trial court properly determined that Exxon breached its duty of reasonable care owed to Terry. In other words, the injury suffered by Terry was a foreseeable result of Exxon's acts and omissions. Accordingly, we overrule the first thirty-one points of error.

In point of error thirty-two, Exxon contends that the trial court's finding that Terry was not contributorily negligent is against the great weight and preponderance of the evidence.[10] Part of Exxon's argument is to the effect that, since Terry felt that his job was dangerous, he should have sought other employment. In our view, this contention amounts to an argument that Terry voluntarily assumed the risk. Assumption of the risk is now subsumed within the issue of contributory negligence (now comparative negligence or comparative responsibility). *See Farley v. M M Cattle Co.*, 529 S.W.2d at 758.

We find little or no evidence in the record concerning the question of whether Terry *voluntarily* assumed the risks associated with working at the station. For example, we find scant evidence regarding Terry's need (or lack thereof) for employment income, and we find little or no evidence concerning the availability of other employment. There was evidence indicating that Terry had only an eighth grade education, and his work history involved primarily manual labor of an unskilled or semi-skilled nature. This evidence would permit a reasonable inference that Terry would have been relatively disadvantaged in the employment marketplace. Upon this state of the evidence, we cannot say that the trial court's finding of no comparative negligence (at least with respect to voluntary assumption of the risk) is against the great weight and preponderance of the evidence.

Exxon also argues that, to the extent that the incident could have been prevented by limiting access to the service station building, Terry was in the best position to ensure his own safety. Exxon notes that Morgan testified that he instructed his employees to lock the bay doors and the door connecting the bay area to the sales office. However, there was conflicting evidence on this issue. Terry testified that Morgan had instructed him to keep the bay doors open in accordance with Exxon policy. Terry also said that the telephone was out in the bay area, and he stated that he had to answer the phone if it rang. The trial court was entitled to resolve the conflicts in the testimony and determine the credibility of the testimony. There was evidence supporting the trial court's finding that Terry was not comparatively negligent, and we cannot say that the finding was against the great weight and preponderance of the evidence. We overrule point of error number thirty-two.

In point number thirty-three, Exxon argues that the trial court erred in denying Exxon's motion to strike the testimony of an economist, Dr. Dale Funderburk. The basis for Exxon's motion was its assertion that Funderburk's testimony was wholly premised upon the findings of a psychologist, Dr. Robert Smith. An earlier motion to strike portions of Smith's testimony had been granted to the extent that Smith's testimony and report could be construed as Smith's expression of a medical opinion. However, the trial court noted that the motion was denied "[t]o the extent that [Smith's evidence] is an opinion of an

10. Contributory negligence is now typically called comparative negligence or comparative responsibility, and, depending upon the percentage of responsibility attributable to a plaintiff, the plaintiff's comparative negligence does not necessarily constitute an absolute bar to recovery for the defendant's negligence. *See* Tex.Civ. Prac. & Rem.Code Ann. § 33.001 (Vernon Supp. 1991).

expert in the area that the witness has testified and established a predicate."

■ Our reading of the record reveals that Smith's report and testimony, to the extent that they were based upon medical determinations, were based upon medical findings of others who possessed medical expertise. Smith's ultimate determinations were not medical in nature. Under these circumstances, we conclude that most, if not all, of Smith's evidence was admissible. See TEX.R.CIV.EVID. 702, 703, 705. Furthermore, the record contains no specification of the evidence, if any, excluded under the trial court's ruling.[11] It was Exxon's burden to show that the record reveals error and to point to those parts of the record where matters complained of, or upon which Exxon relies, are shown. *Most Worshipful Prince Hall Grand Lodge v. Jackson*, 732 S.W.2d 407, 412 (Tex.App.—Dallas 1987, writ ref'd n.r.e.); see TEX.R.APP.P. 74(f). Without any specification of the evidence deemed inadmissible by the trial court (if any), we will assume that sufficient evidence was admitted to support the trial court's findings and conclusions.

■ Thus, we determine that Smith's ultimate conclusions were not vitiated by the trial court's ruling on Exxon's motion to strike parts of Smith's evidence. Accordingly, even if Funderburk's evidence was wholly based upon Smith's conclusions, the trial court did not err in denying Exxon's motion to strike Funderburk's testimony. We overrule point number thirty-three.

Exxon contends in points thirty-four and thirty-five that the evidence was either legally or factually insufficient to support the trial court's award of damages for Terry's future loss of earnings. Exxon's argument is dependent upon its assertion that the conclusions of Smith and Funderburk should be disregarded. Since there is no basis for disregarding those conclusions,

we overrule points thirty-four and thirty-five.

■ In point of error number thirty-six, Exxon maintains that the trial court erred in awarding mental anguish damages to Mary Tidwell because such damages are not recoverable by a person who is not a bystander. The evidence shows that Mary was not present when Terry was injured. Although she arrived at the scene shortly after Terry was shot and saw Terry in the ambulance at the scene, she did not witness the shooting itself. Under virtually identical circumstances, the Texas Supreme Court has held that there is no cause of action for emotional harm based on bystander status. *Freeman v. City of Pasadena*, 744 S.W.2d 923, 923–24 (Tex.1988).

In response to Exxon's argument, Mary notes that the Texas Supreme Court has recognized a cause of action for a child's loss of parental consortium. *Reagan v. Vaughn*, 804 S.W.2d at 466. Mary argues that much of the same reasoning favoring such a cause of action would also apply to recognition of a parental cause of action for loss of a child's consortium. However, the Supreme Court went on to state in *Reagan* that a claim for negligent infliction of mental anguish is separate and distinct from a claim for loss of consortium. Loss of consortium does not include an element of mental anguish. On the other hand, the Court noted, a claim for negligent infliction of mental anguish generally requires proof of bystander status. In the absence of such proof, there can be no recovery for mental anguish. *Id.* at 466–67. In accordance with *Freeman* and *Reagan*, we hold that the trial court erred in awarding damages to Mary for mental anguish because there is no evidence supporting such damages. *See Hewitt v. Chadwick*, 760 S.W.2d 333, 334 (Tex.App.—Texarkana 1988, no writ). We sustain point number thirty-six.[12]

---

11. Exxon simply left it up to the trial court to determine which portions, if any, of Smith's evidence were inadmissible.

12. Mary also notes that the trial court's award to her was for physical pain as well as mental anguish. However, we find no evidentiary support for an award to Mary based on physical pain. Further, the pleadings do not support such an award.

In points of error thirty-seven and thirty-eight, Exxon complains of the trial court's award of attorney fees to the guardian ad litem appointed to represent Terry's interests at trial.[13] Ordinarily, a trial court's decision regarding reasonable compensation for a guardian ad litem will not be overturned unless there is a clear abuse of discretion apparent from the record. *Dawson v. Garcia*, 666 S.W.2d 254, 264 (Tex.App.—Dallas 1984, no writ). A fee allowed a guardian ad litem appointed to protect the interests of a minor is considered to be a cost incurred by the party whose conduct made the appointment necessary. *Id.* at 265; *Minns v. Minns*, 615 S.W.2d 893, 897 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ dism'd).

Exxon first argues that the award was improper because Exxon was guilty of no active or passive negligence that caused or contributed to the injuries suffered by the Tidwells. Our disposition of previous points of error effectively eliminates the basis for this argument. Exxon also contends that the trial court abused its discretion by awarding an excessive and unreasonable fee. Exxon argues that there was an abuse of discretion similar to that found by this Court in the *Dawson* case. We determine that circumstances present in that case are not present in this case.

In *Dawson*, a settlement had been reached, and a joint motion to dismiss all claims was filed. The trial court refused to grant the motion and appointed a guardian ad litem for the minor plaintiff. Thereafter, the guardian and the trial court refused to approve the settlement. The trial court expressed its displeasure with the original attorney hired by the plaintiffs and ultimately pressured that attorney into withdrawing from the case. At the trial court's direction, the guardian ad litem searched for a number of months and finally engaged another attorney to represent all of the plaintiffs. The guardian ad litem, a licensed attorney, fully participated in the trial as though he were a second lawyer for all of the plaintiffs. In awarding fees to the guardian ad litem, the trial court expressed disdain for insurance companies and stated that the defense had been conducted and paid for by major insurance companies. In supplemental findings and conclusions, the trial court expressed its displeasure with the insurance carrier's failure to settle the case for an amount deemed reasonable by the trial court.

On appeal, this Court determined that the defendant had been treated differently because the trial court perceived the named defendant to be a straw defendant whose defense was actually conducted and paid for by an insurance company that had resisted a meaningful settlement. This Court concluded that the amount of the ad litem award was intended to punish "some unknown and unnamed insurance carrier." The trial court's action was therefore determined to be arbitrary and unreasonable. *Dawson*, 666 S.W.2d at 264. Thus, the circumstances in that case were unusual and exceptional.

We find no such circumstances in the present case. Although the guardian ad litem acted as another attorney at the trial of this case, he did so as a representative of Terry. The only evidence presented concerning a reasonable award of fees to the guardian ad litem supports the trial court's award. There is nothing in the record suggesting that the trial court acted arbitrarily in awarding the ad litem fees. Accordingly, we overrule points of error thirty-seven and thirty-eight.

We sustain the thirty-sixth point of error. We reverse the trial court's award of $5,000 to Mary Tidwell for past physical pain and mental anguish, and we render a take-nothing judgment against Mary with respect to those particular damages. Because we have reduced the amount of damages awarded to Mary, we remand this cause for recomputation of the prejudgment interest to be awarded to Mary. In all other respects, we affirm the judgment

---

13. The guardian ad litem was appointed because Terry was under continuing psychiatric care as a result of the event that was the subject matter of this lawsuit.

of the trial court.[14]

14. Ordinarily, when the judgment of this Court is against the appellant (Exxon) but for a lesser amount than the original judgment, the appellant should recover the appellate costs. *See* Tex.R.Civ.P. 139; Tex.R.App. P. 89. However, because we have sustained only one of thirty-eight points of error, thereby reducing appellee Mary Tidwell's award by only a relatively small amount, we determine that each party should bear the appellate costs which it incurred. *See* Tex.R.Civ.P. 141; Tex.R.App.P. 89.