

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-07-00126-CV
_____

$43,774.00 U.S. CURRENCY AND 1997 MODEL
PONTIAC GRAND PRIX, VIN #1G2WP12K7VF323349, Appellants

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law #2
Gregg County, Texas
Trial Court No. 2007-81-CCL2

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

In an attempt to recover his money and his car, Raymond McKinney appeals forfeiture to the State. McKinney has not been accused or charged with any drug-related crime, but his property was confiscated by the State because it was determined to be contraband.

On appeal, McKinney contends the evidence is legally and factually insufficient to support the verdict ordering forfeiture. We affirm the judgment of the trial court.

## I.    The Evidence

While driving through Gregg County, Texas, on his way to the Dallas metroplex from Mississippi, McKinney was stopped for following another vehicle too closely. Officer Tracy Freeman asked McKinney for his license and proof of insurance. McKinney produced a driver's license, but told Freeman that he was purchasing the car and was planning on getting insurance when he arrived in Plano. When he looked into the backseat of this two-door car, Freeman saw a false compartment in the wall of the vehicle and the compartment door lying in the seat. Freeman testified that the upholstery panel had after-market hinges welded to it and a latch that could be opened by use of an electrical switch. Freeman further testified that he had seen such panels in other situations and that, in his experience, such hidden compartments were often used to conceal drugs. When McKinney was asked about the compartment doors, he responded, "What doors?" At that time, McKinney said nothing about money being located in the compartment. After the drug dog had alerted on the vehicle, Freeman detected that there was a similar compartment on the other side of

2

the car. McKinney then showed him how to remotely operate the compartment doors by the use of a switch hidden underneath the steering column.

Freeman asked McKinney if he had drugs, guns, or money in the car, and McKinney told him he had $40,000.00 in the car, in the compartment. Freeman then asked for permission to search. McKinney granted permission, and Freeman (a K-9 officer) ran the dog around the vehicle. Freeman testified that the dog alerted on both doors and the trunk on the outside of the car. He then let his dog inside the car and testified that the dog alerted on the compartment where the currency was. Freeman also described the money as being wrapped in the same way as he had previously seen "narcotics money" packaged, wrapped in rubber bands and tucked inside plastic bags. Freeman testified that, before the dog would alert on the compartment or on the money, drugs had to have come in contact with them in a recently close proximity of time.

On cross-examination, Freeman acknowledged that McKinney had said he was purchasing the vehicle from his wife's cousin, James Woodard, and that when he ran the tags, he believed it came back as registered to that person. In response to cross-examination, the officer admitted that he found no contraband or drug-related items in the vehicle and that there was no indication McKinney was using drugs. Freeman explained the fact that his dog had alerted on areas where no drugs were found by suggesting that narcotics had been in those locations at some earlier time. He suggested the drugs had to have been there more recently than a year and admitted they could have

3

been there more than a few days previously, but the testimony provides no further specificity. Freeman also testified the dog was trained to ignore uncirculated money.

On redirect examination, the officer opined that typically drugs went east and money went west and stated that he had stopped McKinney going westbound on the interstate highway. The State also obtained testimony that it is now becoming more common for narcotics dealers to seek out individuals with no prior criminal history to carry their money for them. The evidence shows that McKinney had no prior felony convictions.

McKinney testified his money had been acquired in a number of different ways—that it came from the sale of a hip-hop business (S&R Clothing; Popular Trends), a dump truck business (he had sold the truck), that he did bail bonds, he gambled, and bought and sold cars. He had sold his part of the business to his partner for $25,000.00 on November 11, 2006,[1] and sold the dump truck to an individual for $24,500.00 on June 28, 2005.[2]

The State also questioned McKinney at some length about the disposition of those funds. Generally, the State was eliciting evidence to show that the funds were banked, but then withdrawn piecemeal rather than as large cash withdrawals.

McKinney's counsel then questioned him, obtaining testimony about his practice, over a number of years, to carry and use large amounts of cash while purchasing clothes in New York and

---

[1]McKinney was stopped January 11, 2007.

[2]He testified he had purchased the truck only six months before that for $11,000.00.

4

Las Vegas for the businesses and that, while making the transition back to Texas, he was moving all of the cash with him that he had available. He testified that, when he and his wife moved from Plano to Mississippi in 2003, he had taken about $60,000.00 in cash with him. He testified he was a state-certified agent for a bonding business and was generally paid in cash. McKinney testified generally that he simply maintained a sizeable cash fund, that money rotated in and out of it, and that it was impossible to keep track of the source of each portion of the funds.

McKinney explained that he and his wife were moving back from Mississippi to Texas, that his wife had already taken an apartment in Plano, and that he was bringing their money to meet her. He also testified that he had been told about the existence of the compartments before agreeing to buy the car and that he had possession of the car for perhaps two or three days before he got ready to come to Texas.

Cassandra McKinney testified that her husband had businesses and made money doing a lot of different things, and that he would buy and sell and make good money doing so. She testified he had always had a lot of cash around, always carried it, for the seventeen or eighteen years she had known him. She testified that many of his business opportunities and purchases required him to have cash available and that he kept it for that purpose.

The trial court upheld the forfeiture and made findings of fact and conclusions of law.

## II. Requirements for Forfeiture

In order for the State to prevail, it was required to prove by a preponderance of the evidence that the property is contraband and thus subject to forfeiture to the State. Chapter 59 authorizes the State to pursue the forfeiture of funds that constitute proceeds from illegal drug trafficking. *See* TEX. CODE CRIM. PROC. ANN. arts. 59.01–.14 (Vernon 2006 & Supp. 2008). In the statutory scheme, property, including currency, is subject to seizure and forfeiture if it is found to be contraband. TEX. CODE CRIM. PROC. ANN. art. 59.02(a). Contraband is property used or intended to be used in the commission of certain felonies, or proceeds derived from those felonies. TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(A)–(D); *see State v. Silver Chevrolet Pickup*, 140 S.W.3d 691, 692 (Tex. 2004).

As applied to this case, contraband is money that is derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance—and is therefore subject to forfeiture. TEX. CODE CRIM. PROC. ANN. arts. 59.01– .02; *$24,156.00 in U.S. Currency v. State*, 247 S.W.3d 739, 743 (Tex. App.—Texarkana 2008, no pet.); *$27,920.00 in U.S. Currency v. State*, 37 S.W.3d 533, 535 (Tex. App.—Texarkana 2001, pet. denied).

The statute places on the State the burden of proving, by a preponderance of the evidence, that the item being forfeited is subject to forfeiture. *$24,156.00 in U.S. Currency*, 247 S.W.3d at 743; *In re One Man's Rolex Watch Yellow Gold*, 223 S.W.3d 451, 452 (Tex. App.—Amarillo 2006, no pet.); *$27,920.00 in U.S. Currency*, 37 S.W.3d at 535. Although defenses and explanations are useful tools for analysis, the burden of proof remains on the State to prove the funds were

contraband—not on the owner to prove their source. After the State meets its burden of proof, there is a statutorily created affirmative defense for innocent owners. TEX. CODE CRIM. PROC. ANN. art. 59.02(c). To prevail under that defense, once the State has met its burden, the burden shifts to parties claiming the innocent-owner defense to prove they acquired an ownership interest in the property before, or during, the act giving rise to forfeiture. *Id.*; *State v. Thirty Thousand Six Hundred Sixty Dollars and no/100*, 136 S.W.3d 392, 410 (Tex. App.—Corpus Christi 2004, pet. denied) (Castillo, J., dissenting); *Bochas v. State*, 951 S.W.2d 64, 71 (Tex. App.—Corpus Christi 1997, pet. denied).

The initial question is whether the State provided sufficient evidence to meet its burden of proof.[3] As previously articulated by this Court, to forfeit the property, the State must show a substantial connection or nexus between the property and the illegal activity. *$27,920.00 in U.S. Currency*, 37 S.W.3d at 535; *$7,058.84 in U. S. Currency v. State*, 30 S.W.3d 580, 586 (Tex. App.—Texarkana 2000, no pet.). This is accomplished when the State proves by a preponderance of the evidence that the money was derived from or intended for use in the manufacture, delivery, sale, or possession of a controlled substance. *$27,920.00 in U.S. Currency*, 37 S.W.3d at 535; *$7,058.84 in U.S. Currency*, 30 S.W.3d at 586. Proof may be made by circumstantial evidence, but

---

[3]A forfeiture proceeding is civil in nature. Thus, the procedures to be followed are those applicable to other civil suits in general. TEX. CODE CRIM. PROC. ANN. art. 59.05(b) (stating that "[a]ll cases under this chapter shall proceed to trial in the same manner as in other civil cases").

the proof must raise more than a mere surmise or suspicion regarding the source of the money. *$27,920.00 in U.S. Currency*, 37 S.W.3d at 535; *$7,058.84 in U.S. Currency*, 30 S.W.3d at 586.

## III. Standards of Review

Under civil preponderance of the evidence standards, evidence is legally insufficient only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). The final test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Wilson*, 168 S.W.3d at 827. In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id*. This is more than a mere question of whether evidence exists that has some remote relation to the verdict. *Id*. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id*. at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. Although we consider the evidence in a light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id*. at 822.

8

When considering a factual sufficiency challenge, we must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

The trial court's findings of fact have the same force and dignity as a jury's verdict on jury questions, and are reviewed for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *City of Hughes Springs v. Hughes Springs Volunteer Ambulance Serv., Inc.*, 223 S.W.3d 707, 709 n.1 (Tex. App.—Texarkana 2007, no pet.).

The State suggests that McKinney has failed to adequately raise factual sufficiency issues on appeal because he did not attack the findings of fact specifically. In this instance, McKinney's argument is that, even if the trial court's findings of fact are supported by evidence, such evidence is insufficient to conclude that the money is contraband.

Even if it is necessary to attack the findings of fact, it is not necessary to specify the name and number of the findings being attacked—so long as it is clear from the brief that particular

9

findings are being attacked.[4]   Under the current rules, a statement of an issue presented in an appellate brief is treated as covering every subsidiary question that is fairly included.  TEX. R. APP. P. 38.1(e).  This brief clearly attacks the crucial factual findings made by the trial court.

## IV.   Legal Sufficiency

### A.   Unpersuasive Evidence

In this case, we dismiss as relatively nonprobative the evidence that the vehicle was being driven in a certain direction and that McKinney was nervous.  *Deschenes v. State*, 253 S.W.3d 374, 383 nn. 9 & 10 (Tex. App.—Amarillo 2008, pet. filed) ("Traveling a particular route does not establish probable cause for forfeiture."  "Nervousness is of minimal probative value, given that many, if not most, individuals can become nervous or agitated when detained by police officers.") (citations omitted).

Other evidence that we find nonpersuasive is the State's testimony that "narcotic dealers" solicit persons with no criminal record to transport money derived from drug transactions.  Many cases have held that a criminal record of prior drug convictions is probative on the issue of whether the money was obtained by illicit means.  It would be illogical to also allow an inference that the lack of a criminal record was probative on that issue.

---

[4]*See Exxon Corp v. Tidwell*, 816 S.W.2d 455, 458 (Tex. App.—Dallas 1991), *rev'd on other grounds*, 867 S.W.2d 19 (Tex. 1993) (appellate court rejected complaint appellant had not challenged findings of fact, when apparent from argument that general findings were attacked and court believed the specific findings subsumed under those findings had thereby been attacked); *see also* 6 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE 2D § 18.12 n.132 (1998).

## B. Import of Dog Alert and Hidden Compartment

The overriding issue in this case is the import of a positive dog alert on the compartment where the money was located in the vehicle. The testimony was that the drug dog alerted on both doors of the secret compartment in the vehicle and the trunk area. The cash was located in one side of the compartment. The relevance of a dog alert in this context has been subject to considerable debate. This Court, and several other courts of appeals, have held that a positive alert by a drug detection dog, standing alone, does not constitute evidence that money was used in connection with a drug deal. *$7,058.84 In U. S. Currency*, 30 S.W.3d at 588 (citing *$80,631.00 v. State*, 861 S.W.2d 10, 12 (Tex. App.—Houston [14th Dist.] 1993, writ denied)); *Deschenes*, 253 S.W.3d 374.

But the Texas Supreme Court has authorized the consideration of a drug detection dog's alert in determining if money found in a search has a substantial connection to criminal activity. *State v. $11,014.00*, 820 S.W.2d 783 (Tex. 1991). In *$11,014.00*, the Texas Supreme Court reversed a court of appeals that had found the evidence legally insufficient. The facts revealed that the defendant was observed at the Houston Hobby airport deplaning a flight from New York City. A Houston officer, trained in the use of drug courier profiles, identified the defendant as a potential drug smuggler. After observing him carrying a light briefcase, the officer asked to speak to the defendant, a Jamaican citizen who was traveling under an assumed name. The defendant was arrested by an immigration officer. A Houston Police Department officer and a dog, both certified by the National Narcotic Detector Dog Association, came to the scene. The dog alerted on the suitcase; the money was then

11

removed, and the dog alerted directly on the money. Based on this alert, the officer testified the money had been in recent close proximity to a controlled substance. *Id.* at 784–85. The Texas Supreme Court held the evidence was legally sufficient to support an inference that the money was derived from the sale and/or distribution of a controlled substance.

With these precedents, we will consider the evidence in this case. The significant items are: (1) the automobile was equipped with secret compartments; and (2) the drug dog alerted on a portion of the vehicle where the money was located.

This automobile was equipped with "false compartments" in the backseat. The compartments appeared to have "after-market hinges" welded on the seat with a type of electrical switch on the doors of the compartments. Freeman testified, without objection, that such compartments are generally used to conceal narcotics. When asked about the doors on these compartments, McKinney's initial reaction was to ask, "What doors?" After pointing out the doors in the backseat, McKinney stated, "That's his"—referring to Woodard, from whom McKinney was purchasing the vehicle. Later, when asked if he had any narcotics, weapons, or large sums of money, McKinney answered there was $40,000.00 in one of the compartments.

Consent to search the vehicle was obtained, at which time the officer produced his drug detection dog, who alerted on both compartment doors and on the trunk area. The dog specifically alerted to the compartment where the $40,000.00 was located. McKinney later showed the officer a hidden switch mounted under the steering column to open the compartment doors.

12

Freeman further testified, without objection, that part of the dog's training prevented him from alerting if there was no odor of narcotics present. In response to a leading question, Freeman testified that it was his "expert" testimony that drugs had recently come into contact with this money. He further testified the money was "packaged the way I have experienced narcotics being packaged" because it was wrapped in rubber bands and placed in plastic bags.

This Court held in *$7,058.84 in U.S. Currency*, 30 S.W.3d at 588, that the evidence as to the dog alert was insufficient as the testimony was only that the dog breathed heavily, became tense, and began to scratch the file cabinet in which the police had placed the money. We concluded it could not be determined if the dog reacted to the presence of narcotics on the money or to something else. *Id.* at 588. In making that determination, we distinguished the *$11,014.00* case because there the testimony was that the money had been in recent close proximity to a controlled substance and the dog would not alert on the money absent an odor from a controlled substance. *Id.* Such evidence was lacking in *$7,058.84*, but is not lacking in this case. Based on the dog's alert, Freeman testified the money had recently been in close proximity to a controlled substance. Further, he testified the dog would not alert on the money without an odor of narcotics; consequently, the distinction made in the facts of *$7,058.84* and the Texas Supreme Court case (*$11,014.00*) is not present here.

## C.    Review of Factors in Assessing Legal Sufficiency

In *$7,058.84*, we noted that courts have reviewed at least five factors in assessing the sufficiency of the evidence in a forfeiture case: (1) the proximity of the money to the drugs and to

evidence of drug trafficking; (2) evidence the money was previously in contact with drugs, e.g., through a canine alert; (3) suspicious activity consistent with drug trafficking; (4) the amount of money at issue; and (5) the presence of expert testimony indicating there was probable cause to seize the property subject to forfeiture, e.g., that a substantial connection exists between the property to be forfeited and the criminal activity. *Id.* at 586–87.

### 1. *Proximity of the money to drugs or evidence of drug trafficking*

No drugs or drug paraphernalia were found in the vehicle. The money was wrapped in plastic bags. Some courts have found that wrapping cash in cellophane-type material may be used to conceal the smell of drugs and avoid detection by drug dogs. *United States v. $252,300 in United States Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007); *United States v. U.S. Currency, $42,500*, 283 F.3d 977, 982 (9th Cir. 2002). While this fact, standing alone, does not prove a connection to drug trafficking, it is of some probative value in determining a connection of the money to drug trafficking.

### 2. *Evidence the money was previously in contact with drugs*

The money was found in a secret compartment on which the drug dog alerted. Testimony was admitted that the dog was trained not to alert unless it detected the odor of narcotics. The officer testified that, for the dog to alert on the compartment, the money or the compartment must have come into contact with drugs in a recent proximity of time.

14

*3.      Suspicious activity consistent with drug trafficking*

We find the fact that the secret compartments opened by a remote switch constitutes a suspicious condition that is consistent with drug trafficking. Certainly, there could be other reasons to install such a compartment, but the very existence of a hidden compartment in a vehicle indicates the user of the vehicle may attempt to hide or secrete items in it. It is consistent with the secretion of drugs, money, or both.

Additionally, McKinney originally professed that he had no knowledge of the compartments, but later showed the officer the remote control switch to operate the doors.

*4.      The amount of money at issue*

Here, the amount of money is substantial. That alone is not conclusive, but only a factor to consider.

*5.      The presence of expert testimony indicating that there was probable cause to seize the property subject to forfeiture—that a substantial connection exists between the property to be forfeited and the criminal activity*

Freeman testified both he and the canine involved had been trained. Freeman responded affirmatively when he was asked whether it would be his "expert testimony" that drugs recently contacted the money or the compartment. Even though evidence developing his expertise was extremely slight, no objection was made to this testimony.

In weighing the circumstantial evidence, based on Texas Supreme Court precedent, we conclude some evidence supports the trial court's conclusion the money was derived from or

15

intended for use in distribution or possession of a controlled substance. The evidence of a compartment that appears to be installed for the purpose of secreting items, together with the positive dog alert on that compartment, supports such a finding. Considering the evidence in a light most favorable to the trial court's finding and indulging in every reasonable inference that would support it, we find the evidence is legally sufficient.

## V.    Factual Sufficiency

Finally, McKinney alleges the evidence is not factually sufficient. We have detailed above the evidence relied on by the State. McKinney also presented evidence that he had no prior felony convictions and that the cash came from various sources. Among these sources were the sales of a hip-hop business and a dump truck, a bail bond business, gambling, and buying and selling used cars.

The events giving rise to this forfeiture occurred January 11, 2007. According to McKinney, he sold his part of the hip-hop business to his partner for $25,000.00. He produced documents indicating the agreement was entered October 31, 2006, but sworn to January 31, 2007. Additionally, he produced a statement from his partner that the "purchase" was made November 11, 2006, but that "buyout affidavit" was verified February 20, 2007, after the date McKinney was stopped. A copy of a bill of sale was introduced showing that McKinney bought the dump truck in February 2005 for $11,000.00 and sold it June 28, 2005, for $24,500.00. Bank records showed withdrawals from McKinney's and his wife's accounts over a period of time, but McKinney did not

16

attempt to establish the specific origin of the $43,774.00. He relied primarily on the fact that his type of business involved a lot of cash transactions.

While this evidence showed McKinney had access to and dealt in cash transactions, some of the evidence of the source of the money was questionable. The sale of the dump truck for $24,500.00 took place one and a half years before this money was seized. Additionally, the verification of the signatures on the documents evidencing the sale of the hip-hop business occurred after McKinney was stopped January 11, 2007. The trial court considered that the records of the sale of the truck and business, some of which were dated after the seizure of the funds, negatively affected McKinney's credibility about the source of the funds. We do not believe the trial court's judgment is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust.[5]

Further, based on the facts recited above, we do not conclude that the State's case is so weak that we must declare that the trial court's finding was clearly wrong and manifestly unjust.

## VI. Additional Comments on Evidence in Forfeiture Cases

While we believe that the evidence is sufficient in this case, we add some additional comments. In an attempt to meet the requirements of the forfeiture statute, the State has offered, and

---

[5]On this issue, this case is significantly different from another forfeiture case recently considered by this Court. In *$130,510 in U.S. Currency v. State*, cause number 06-07-00132-CV, there was substantial evidence contrary to the finding that the cash had a nexus to illegal activity (documentary evidence revealed that the owner had access to a large sum of money due to a seven million dollar wrongful death recovery).

17

courts have accepted, some evidence that can only be considered as speculation that money found is derived from some drug transaction. The fact that a person is driving a vehicle on an interstate highway is virtually meaningless in determining a connection to illegal substances. We realize that narcotics and cash derived from drug transactions are transported by vehicles traveling on the interstate highway or other major highways. But to conclude from that general premise that a particular vehicle driving on that highway is likely to be involved in possessing or selling drugs or has monies derived from it, is simply a fallacy in reasoning and logic. It adds nothing to the quest to determine the issues involved.

Additionally, it may well be true that "drugs travel east and money travels west," but once again, simply because a vehicle is driven in one direction or the other does not help determine which of all those persons driving those vehicles in such direction is violating the law.

Finally, we would suggest the Texas Supreme Court consider addressing the requirements for the use of dog detection evidence in forfeiture cases. The original reason for using dogs was to determine if there was probable cause to search. This rationale is understandable, as trained dogs are used only to provide an officer with a reasonable belief that an object contains some evidence of a crime. That reasonable belief authorizes the object to be searched without violation of the citizen's constitutional rights. However, a dog sniff has never provided the evidence that is used to convict the defendant of the offense. After the dog has alerted, a search takes place; if nothing is found, no charges would be filed for possession or distribution of a drug. In other words, even

18

though the officer had a reasonable belief that criminal activity was afoot, after investigation, it proved to be unfounded. Even if a substance is found as a result of the search, it is subjected to scientific testing to determine its chemical composition. That scientific evidence is then presented, subject to cross-examination, in the trial.

While forfeiture law is on the civil side of the docket, and subject to a lesser standard of proof, that alone does not explain the difference between the way canine detection evidence is considered and used in the two situations. The question is: Does this particular barking dog reveal evidence of a connection to illegal drugs? If such evidence is admitted, should it not be subjected to the same scrutiny that we demand of other evidence from sources? For instance, we use an intoxilyzer to determine if a person's breath contains an illegal amount of an alcoholic beverage. But before that testimony is accepted in court, proper evidence must be submitted that the machine is in proper working order and that it is periodically recalibrated to determine its accuracy. We also expect someone with expertise to be able to explain the scientific principles on which we may rely to determine the results meaningful.

Likewise, the proponent of a dog drug alert should establish an adequate foundation. In this case, the only evidence was that Freeman and the canine had "several hours" of training and had worked together for five and a half years. At the last conference, the dog finished in fourteenth position of 125 dogs in competition.

At a minimum, the evidence should establish the certification the dog has achieved and the nature and extent of the training for both the dog and the handler.  Additionally, the dog's accuracy rate is important.  Finally, the evidence should demonstrate the steps taken to ensure a reliable test of the money at issue.  We urge the Texas Supreme Court to adopt such requirements in forfeiture cases.  *See Jacobson v. $55,910 in U.S. Currency*, 728 N.W.2d 510, 529 (Minn. 2007).[6]

Based on the foregoing reasons, we affirm the judgment of the trial court.


Jack Carter
Justice


Date Submitted:     June 18, 2008
Date Decided:       September 12, 2008

---

[6]Since it is not raised in this case, we will not delve into the controversy surrounding the "currency contamination" theory (that 75–100% of all United States currency has some traces of cocaine).  That issue has convinced some courts that dog alert evidence is not probative. *Muhammed v. Drug Enforcement Agency*, 92 F.3d 648 (8th Cir. 1996); *United States v. $5,000 in U.S. Currency*, 40 F.3d 846 (6th Cir. 1994).  More recently, other courts have found that a properly trained drug detection dog alerts only to methyl benzoate, which is a cocaine by-product that evaporates rapidly from the surface of paper currency. *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 455–60 (7th Cir. 2005).  Some of these courts have required a "sophisticated dog alert"—meaning the State must present evidence that the drug detection dog would not alert to cocaine residue found on currency in general circulation; that the dog was trained to and would only alert to the odor of a chemical by-product of cocaine-methyl benzoate. *In re Sumareh v. Doe (In re $80,045 in United States Currency)*, 161 F. Appx. 670, 671 (9th Cir. 2006) (mem. op., not designated for publication); *United States v. $22,474.00 in United States Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001).