

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-19-00065-CV

---

1812 FRANKLIN STREET, BONHAM, TEXAS, ET AL., Appellants

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CV-18-43793

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

O P I N I O N

In this civil forfeiture case appealed by Richard Lynn Clark only, the trial court found that a home owned by Clark and his wife, Ester,[1] "was effectively a flophouse." It declared the home and 0.22 acres of land located at 1812 Franklin Street, Bonham, Texas (Property), contraband used in the commission of several drug-related offenses and ordered its forfeiture. Among other claims raised on appeal, Clark argues that the State failed to meet its burden of proof to show that the home was contraband, that he proved the innocent-owner defense because he was in prison while Ester was using the property to commit the drug-related offenses without his knowledge, and that the forfeiture violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

We find that (1) legally and factually sufficient evidence supports the finding that the Property was contraband, (2) legally and factually sufficient evidence supports the rejection of Clark's innocent-owner affirmative defense, (3) the forfeiture does not violate the Excessive Fines Clause, and (4) Clark has failed to preserve his remaining points of error. Accordingly, we affirm the trial court's judgment.

*(1)* *Legally and Factually Sufficient Evidence Supports the Finding that the Property Was Contraband*

Chapter 59 of the Texas Code of Criminal Procedure authorizes the forfeiture of contraband, which is defined as property used in the commission of various enumerated offenses, including any second-degree felony and any felony under the Texas Controlled Substances Act. TEX. CODE CRIM. PROC. ANN. arts. 59.01(2)(A)(i), (2)(B)(i) (Supp.); 59.02(a). The State bore the

---

[1]Ester does not appeal.

2

burden to prove by a preponderance of the evidence that the Property was contraband. *$43,774.00 U.S. Currency v. State*, 266 S.W.3d 178, 182 (Tex. App.—Texarkana 2008, pet. denied); *One (1) 1998 Blue Chevrolet Camaro v. State*, No. 02-10-00252-CV, 2011 WL 3426263, at *2 (Tex. App.—Fort Worth Aug. 4, 2011, no pet.) (mem. op.).  Clark argues that the State failed to meet its burden with sufficient evidence.

In reviewing the sufficiency of the evidence to support a trial court's findings in a bench trial, we use the same standards that apply to review of a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Cavendish v. Atashi Town Homes, LLC*, No. 06-14-00023-CV, 2014 WL 7140309, at *3 (Tex. App.—Texarkana Dec. 16, 2014, no pet.) (mem. op.).

Our legal-sufficiency review asks "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 582 (Tex. App.—Texarkana 2012, no pet.).  "In looking at the evidence, we credit favorable evidence if a reasonable [fact-finder] could and disregard contrary evidence unless a reasonable [fact-finder] could not." *Petrohawk Props., L.P. v. Jones*, 455 S.W.3d 753, 770 (Tex. App.—Texarkana 2015, pet. dism'd) (citing *City of Keller*, 168 S.W.3d at 827).

> Under civil preponderance-of-the-evidence standards, evidence is legally insufficient only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact.

3

*Forty-Five Thousand Four Hundred Eighty Dollars U.S. Currency v. State*, No. 06-12-00090-CV, 2013 WL 1343209, at *4 (Tex. App.—Texarkana Apr. 4, 2013, pet. denied) (mem. op.) (citing *City of Keller*, 168 S.W.3d at 810; *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998)).

"More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions." *Petrohawk Props., L.P.*, 455 S.W.3d at 770 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In reviewing the factual sufficiency of the evidence, we weigh all evidence and set aside a verdict only "if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Petrohawk Props., L.P.*, 455 S.W.3d at 779 (quoting *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

In February 2015, Clark and Ester purchased the Property during their marriage for $45,000.00. At trial, Clark admitted that he had smoked methamphetamine for a few months that year. Luke Rattan, a former officer with the Bonham Police Department (BPD), testified that he was dispatched to the Property because family members claimed that Clark was belligerent while "intoxicated or high on methamphetamine." According to Rattan, someone gave him a glass pipe they had retrieved from Clark's person that contained drug residue. Rattan testified that he took the pipe but did not arrest anyone.

A few months later, in August 2015, Rattan stopped Clark on his motorcycle and found him in possession of 5.14 grams of methamphetamine. Clark told Rattan he was on his way to the Property and admitted at trial that he intended to keep the drug on the Property. Clark pled guilty to the second-degree felony of possessing more than four, but less than 200, grams of methamphetamine. Pursuant to a plea agreement, Clark was sentenced to eight years' imprisonment and ordered to pay a $1,500.00 fine.

While he was incarcerated, Clark gave his sister, Beverly Herndon, power of attorney after discovering that Ester had withdrawn and spent $10,000.00 from the joint account of Herndon and the Clarks in November or December of 2015. Herndon also told Clark that, before she found the money missing, "the lights had been turned off a couple times, the water had been cut off, and [they] were having to pay all of these additional fees because [Ester] wasn't paying the bills on time even though money was there." Clark directed Herndon to pay the bills on the Property, make sure his children had enough food, and provide Ester with money. Despite this arrangement, the evidence showed that Ester began using the Property to distribute methamphetamine. Clark and Ester's son, Jimmy, testified that he lived at the Property after Clark was sent to prison. According to Jimmy, Ester, who never had a job in her life, began staying out late after Clark's arrest and invited many "odd people" to the Property at "odd times at night." Jimmy said he found "different substances" and "different baggies in the [Property]" including some remnants of white crystals. By 2016, Jimmy no longer felt safe on the Property and moved in with Herndon.

In September 2017, Melanie Elliott, a detective with the BPD, testified that she was dispatched to the Property because of an argument among three of the Clarkses' children.

5

According to Elliott, two of the children admitted drug use, and Elliott obtained their consent to search the home. Elliott arrested one child after she found methamphetamine in the child's bedroom.

According to William Abbott, an investigator with the BPD, part-time surveillance on the Property was initiated after the BPD received several reports by neighbors complaining of excessive traffic, drug sales on the Property, and the presence of "wanted people." In January 2018, Elliott located a runaway harbored on the Property along with several people that were "known to abuse narcotics." Elliott testified that the runaway later left the Property, was arrested when he returned with a stolen car, and was found with marihuana. Abbott testified that this incident prompted full-time surveillance on the Property.

In April 2018, Elliott watched Cashonda Jones leave the Property in her vehicle, conducted a traffic stop, and arrested her for possessing 0.13 grams of methamphetamine and drug paraphernalia. In May 2018, Elliott watched Alicia Spencer, who was living on the Property and was known to have a narcotics history, drive off the Property with Justina Lovell. Elliott stopped Spencer and found a methamphetamine pipe inside of her backpack.

Herndon told Clark that Ester was allowing people unknown to both her and Clark to live on the Property and was buying them food. Clark and Herndon both testified that, to force Ester to kick out the unknown people, Clark instructed Herndon to stop paying bills and to feed the children at her house. According to Herndon, Clark stopped the cash flow in April or May 2018.

In July 2018, BPD raided the home after a controlled buy was made on the Property. Abbott testified that a confidential informant traveled to the Property to buy methamphetamine

6

from Ester. Ester told the informant that she did not currently have methamphetamine but arranged to obtain the methamphetamine from another dealer. A videotape of the controlled purchase showed that the dealer came to the Property to sell the drugs to the confidential informant.

Twenty minutes after the controlled buy, BPD stopped a vehicle leaving the Property and found its occupants in possession of methamphetamine and drug paraphernalia. After obtaining a search warrant for the Property, Abbott testified that he found and arrested Blake Francis, Lexi Langford, Trace Smith, and Nathan Mandrell for possessing methamphetamine inside of the Property and Nick Montgomery on an outstanding warrant.[2] Ester was convicted of manufacture or delivery of less than one gram of methamphetamine, a state jail felony, and was placed on community supervision.

Abbott, Elliott, and another BPD officer, Kevin Connors, all testified that the Property was being used to distribute methamphetamine.

In his pro se brief, Clark argues that, even though he "used drugs in his home out of sight of his children, off and on for years," the evidence is insufficient to prove the house was contraband because he never sold methamphetamine from the home. Clark also cites to various provisions of the Texas Family Code and complains that the trial court held him responsible for Ester's actions even though she had abandoned the marriage and lived in adultery with someone else. He also argues that the State did not prove he knew about the illegal activities. Clark's arguments misunderstand the State's burden.

---

[2]The State introduced laboratory reports showing that the substance possessed by Mandrell was methamphetamine.

The State was required to show only that the home was contraband that was subject to forfeiture. TEX. CODE CRIM. PROC. ANN. art. 59.02(a). This burden is met when the preponderance of the evidence shows that the property was "intended for use in the . . . delivery, sale, or possession of a controlled substance." *$43,774.00 U.S. Currency*, 266 S.W.3d at 183. Here, the State proved that Ester used the Property in committing a drug-related offense by introducing testimony and a video of the controlled buy. This evidence was sufficient by itself to show that the Property met the statutory definition of contraband. *See* TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(B)(i). The State additionally showed that, for a period of many months, drugs and paraphernalia were found in the Property, on the persons of people in the Property, and during traffic stops of vehicles leaving the Property. As a result, the State showed "a substantial connection or nexus between the property and the illegal activit[ies]." *$43,774.00 U.S. Currency*, 266 S.W.3d at 182–83.

Clark's Texas Family Code arguments and complaint that he had no knowledge of Ester's activities have no bearing on the issue of whether the State met its burden of proof to show that the Property was contraband. This is because "[c]ommunity property is not exempt from forfeiture where such property is used by a spouse in a manner that violates the Texas Controlled Substances Act, even though the property is used by one spouse without the knowledge or consent of the other spouse." *Gray v. State*, No. 03-99-00235-CV, 1999 WL 996769, at *2 (Tex. App.—Austin Nov. 4, 1999, no pet.) (mem. op., not designated for publication) (citing *Bochas v. State*, 951 S.W.2d 64, 67 n.2 (Tex. App.—Corpus Christi 1997, writ denied)); *Gaston v. State*, 641 S.W.2d 261, 264 (Tex. App.—Houston [14th Dist.] 1982, no writ). In other words, while establishing the innocent-owner defense requires the owner to establish a lack of knowledge of the illegal activity, the State

does not have to show that the owner had knowledge of the illegal activity in order to prove that the property is contraband. *See Gaston*, 641 S.W.2d at 264.

We conclude that the evidence is both legally and factually sufficient to prove, by a preponderance of the evidence, that the Property was contraband. Therefore, we overrule this point of error.

*(2)* *Legally and Factually Sufficient Evidence Supports the Rejection of Clark's Innocent-Owner Affirmative Defense*

In addition to raising a general legal sufficiency complaint, Clark also argues that the evidence is legally insufficient to support the forfeiture because he established the innocent-owner affirmative defense. "When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in support of the issue." *Cavendish*, 2014 WL 7140309, at *3 (quoting *Hampden Corp.*, 2014 WL 2921655, at *6 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam); *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 710 (Tex. App.—Dallas 2011, pet. denied))). "The appellant must show that there is no evidence to support the trial judge's finding and that the evidence conclusively establishes the finding urged by the appellant." *Id.* (quoting *Hampden Corp.*, 2014 WL 2921655, at *6) (citing *R.J. Suarez Enters., Inc. v. PNYX L.P.*, 380 S.W.3d 238, 245 (Tex. App.—Dallas 2012, no pet.))).[3]

---

[3]"Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *Id.* at *3, n.6 (quoting *Hampden Corp.*, 2014 WL 2921655, at *6 (quoting *City of Keller*, 168 S.W.3d at 816)).

"After the State meets its burden of proof, there is a statutorily created affirmative defense for innocent owners." *$43,774.00 U.S. Currency*, 266 S.W.3d at 182 (citing TEX. CODE CRIM. PROC. ANN. art. 59.02(c)). As applicable here, "[t]o prevail under that defense, once the State has met its burden, the burden shifts to parties claiming the innocent-owner defense to prove" "that the owner or interest holder was not a party to the offense giving rise to the forfeiture and that the contraband . . . was used or intended to be used without the effective consent of the owner or interest holder in the commission of the offense giving rise to the forfeiture." TEX. CODE CRIM. PROC. ANN. art. 59.02(h)(1)(C); *see $43,774.00 U.S. Currency*, 266 S.W.3d a 182.

Officers Abbott, Elliott, and Connors all testified that Clark was not involved in the drug activity they saw and was not connected to the BPD's investigation. Therefore, the evidence at trial showed that Clark was not a party to the offenses giving rise to the forfeiture. Because Clark established the first requirement of his innocent-owner defense, we turn to the second requirement that the contraband "was used or intended to be used without [his] effective consent . . . in the commission of the offense giving rise to the forfeiture." TEX. CODE CRIM. PROC. ANN. art. 59.02(h)(1)(C). While the term "effective consent" is not defined in Chapter 59 of the Texas Code of Criminal Procedure, we have previously held that "[e]ffective consent does not require express consent." *.39 Acres v. State*, 247 S.W.3d 384, 390 (Tex. App.—Texarkana 2008, pet. denied). Therefore, implied consent is sufficient. *See id.* at 390 n.4.

Clark bears the burden to show there was no evidence to support the rejection of his innocent-owner defense and that the evidence conclusively established his defense. On this record, he cannot meet this burden.

10

Clark admitted that he used methamphetamine for a few years before his arrest and that he smoked the drug on the Property. Herndon testified that, when Clark acquired the 5.14 grams of methamphetamine that led to his arrest, Clark promptly drove it to Ester with the intention of showing her the purchase and then told Rattan that he intended to take the drug home to the Property. This evidence, and the weight of the methamphetamine, which was high enough to elevate Clark's offense to a second-degree felony, was sufficient to support an inference that Clark and Ester were supportive of drug use on the Property.

The evidence also showed that this support continued after Clark went to jail. Soon after he was incarcerated, Herndon reported that Ester took $10,000.00 from their joint account, spent a lot of money, and did not pay utility bills even though Clark was providing the money to do so. Jimmy testified that Ester began inviting others to use drugs in the Property at all odd hours in the night. He moved in with Herndon after finding bags containing drugs and concluding he was not safe living in the Property. Clark kept in touch with Herndon during his incarceration and Jimmy testified that Clark was aware of "what was going on at the house" as a result of letters Herndon wrote to him. Based on this evidence, the court could have concluded that, as early as 2016, Clark, who knew that Ester did not work, was aware that Ester was using money to acquire and use drugs and was allowing others to use drugs on the Property.[4] Yet, he continued to support Ester by providing her with money and authorizing Herndon to make utility bill payments on their behalf.

_____

[4]Ester testified, "I never had a job because [Clark] never wanted me to work."

This evidence supported an inference that Clark impliedly consented to Ester's acquisition of drugs, her drug use, and the use of the Property to traffic in drugs.

Clark's support of Ester and her activities continued for years until Herndon reported that Ester was allowing random people to live in the house and was buying them food with the money Clark was providing for her. As a result, Clark decided to stop paying Ester's bills in April or May 2018.[5] Clark admitted his awareness of many people coming in and out of the house and staying the night but claimed that he was completely unaware of drug activity on the Property during his incarceration. Herndon said the condition of the house before the seizure was so "horrid" she would not even let her dog live in it. Because of Clark's communication with Herndon and Jimmy's testimony that Clark knew what was going on, the trial court could have rejected Clark's self-serving testimony. Instead, the trial court could have found that Clark impliedly consented to the drug-related activity at the Property but stopped paying bills only because he did not consent to others living in the home.

"The law does not allow [one] to simply assume the posture of a mythical/proverbial ostrich with his head in the sand, ignoring the use of his property as a drug haven and thereby avoiding the consequences of seizure." *Id.* at 390–91. On this record, it appears that this is precisely what Clark wished to do. Because we find that some evidence supported the trial court's rejection of Clark's affirmative defense and Clark cannot establish as a matter of law his lack of consent to the drug-related activity on the Property, we overrule this point of error.

---

[5]Clark's brief admits that he was aware of a possibility of illegal activity on the Property.

12

*(3)     The Forfeiture Does Not Violate the Excessive Fines Clause*

Invoking the Excessive Fines Clause, Clark also argues that the forfeiture of the home was grossly disproportionate to the gravity of his offense. "[T]he protection against excessive fines has been a constant shield throughout Anglo-American history: Exorbitant tolls undermine other constitutional liberties." *Timbs v. Indiana*, 139 S.Ct. 682, 689 (2019). That clause restricts the government's power to punish for some offense by exacting value from an offender, whether in cash or in kind. *2007 Infiniti G35X Motor Vehicle, Vin JNKBV61E17M708556 v. State*, No. 06-13-00057-CV, 2014 WL 991970, at *1 (Tex. App.—Texarkana Mar. 13, 2014, no pet.) (mem. op.); *see Austin v. United States*, 509 U.S. 602, 609–10 (1993); *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989). "A forfeiture is unconstitutional under the Excessive Fines Clause if the amount of the forfeiture 'is grossly disproportional to the gravity of the defendant's offense.'" *2007 Infiniti G35X Motor Vehicle*, 2014 WL 991970, at *1 (quoting *United States v. Bajakajian*, 524 U.S. 321, 337 (1998)).

Conducting a de novo review, we determine whether the forfeiture is grossly disproportionate under the direction of the *Bajakajian* opinion. *Id.* (citing *Bajakajian*, 524 U.S. at 336–37). Although no single test has become an exclusive and clear standard, *Bajakajian* considered

> (1) the nature of the offense, (2) the relationship of the offense to other illegal activities, (3) whether the defendant was in the class of persons addressed by the forfeiture statute, (4) the maximum fine and sentence for the offense committed and the level of culpability reflected by the penalties, and (5) the harm that the defendant caused.

13

*Id.* at \*4 (citing *Bajakajian*, 524 U.S. at 337–39); *see One (1) 1998 Blue Chevrolet Camaro*, 2011 WL 3426263, at \*3. We have adopted these factors in our analysis of whether a forfeiture violates the Excessive Fines Clause and have labeled it the "*Bajakajian* proportionality test." *2007 Infiniti*, 2014 WL 991970, at \*4.

Here, contrary to Clark's argument, the forfeiture did not result from his arrest. Rather, in considering the nature of the offense, we note that the forfeiture was initiated after BPD surveillance of the Property and a raid revealed it to be a drug haven run by Ester. As a result of the raid, Ester was convicted of manufacture or delivery of less than one gram of methamphetamine, and four others were arrested for possession of methamphetamine in the home.[6] Ester's delivery of methamphetamine was linked to other offenses. The State introduced evidence that several arrests were made, during the surveillance period, of people found in possession of the drug or drug paraphernalia after leaving the Property. Ester's drug dealing had also led to other illegal activities like harboring runaways and stolen property and letting others possess and use drugs on the Property. We find that the first two *Bajakajian* factors weigh against finding that the forfeiture violated the Excessive Fines Clause.

Unquestionably, Ester was in the class of persons addressed by the forfeiture statute since "[t]he civil forfeiture statute unquestionably targets drug traffickers." *$27,877.00 Current Money of U.S. v. State*, 331 S.W.3d 110, 122 (Tex. App.—Fort Worth 2010, pet. denied) (citing TEX. CODE CRIM. PROC. ANN. arts. 59.01(2)(B)(i), 59.02(a); TEX. HEALTH & SAFETY CODE ANN.

---

[6]Although its possession or use is a nonviolent offense, methamphetamine is a Penalty Group 1 drug and has widely known dangerous effects.

14

§ 481.112(b)). "[T]he seriousness of [the] criminal activity and the destructive effects of drugs on today's society weigh heavily in analyzing proportionality." *Id.* Thus, the third *Bajakajian* factor supports the forfeiture.

Next, Ester's state jail felony carried a maximum fine of $10,000.00 and a maximum sentence of two years' imprisonment. *See* TEX. PENAL CODE ANN. § 12.35(b). Additionally, four others were arrested in the home for possessing methamphetamine, which they presumably purchased on the Property with Ester's approval. Each possession offense, which the trial court could have found Ester encouraged, was at least a state jail felony. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b). Aggregated, the maximum fines for each of these offenses exceeded the $45,000.00 purchase price for the Property. Though no evidence suggested a recent valuation of the Property, the evidence did set out the poor condition of the Property. Nothing suggests it was valued at or above the original price after its recent use.

As for the harm caused by the offense, "[i]t is common knowledge that possession, use, and distribution of illegal drugs represents one of the greatest problems affecting the health and welfare of our population. Studies clearly demonstrate the direct nexus between illegal drugs and crimes of violence." *1992 BMW VIN WBABF4313NEK00963/Brandon Lee Thompson v. State*, No. 04-07-00116-CV, 2007 WL 2608364, at *2 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (quoting *Thomas v. State*, 916 S.W.2d 578, 583 (Tex. App.—San Antonio 1996, no writ) (citing *Robinson v. State*, 906 S.W.2d 534, 537 (Tex. App.—Tyler 1995, no writ) ("Frequently, drug activity is also the contributing factor of the 'necessary' commission of other crimes by the individual to support a habit. Our entire society is negatively affected by criminal

drug activities."); *Jackson v. State*, 807 S.W.2d 387, 390 (Tex. App.—Houston [14th Dist.] 1991, writ ref'd) ("The prohibition of possession of even unusable quantities of [Penalty Group 1 controlled substances] reflects the concern of the legislature with drug abuse in our society."))). "Thus, Texas courts view the possession of [Penalty Group 1 controlled substances] as inherently harmful to society." *Id.*

There was ample evidence showing that Ester used the property to traffic in drugs and to allow such by others, and it is unquestionable that the civil forfeiture statute was designed to permit the State to seize drug havens. After reviewing all the *Bajakajian* factors, we do not find that the Property's forfeiture was grossly disproportionate to the offenses giving rise to the forfeiture. We overrule Clark's third point of error.

### (4)    *Clark Has Failed to Preserve His Remaining Points of Error*

Clark also argues that double jeopardy and collateral estoppel barred the trial court's consideration of his 2015 conviction, the forfeiture of his home was barred by double jeopardy, the trial court erred in taking judicial notice of unobjected-to testimony from another case, and officers offered allegedly perjured testimony. None of these complaints were properly raised or ruled on by the trial court.

16

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2).

Because these complaints were not preserved, we overrule Clark's remaining points of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     February 26, 2020
Date Decided:       March 27, 2020

17